<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| Ian Lemons, | : | |
| | : | Civil Action No. 12-2355(RMB) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| Charles Warren, | : | |
| | : | |
| Respondent. | : | |
| | : | |

**BUMB**, District Judge

     This matter is presently before the Court upon submission of a Petition for a Writ of Habeas Corpus under Title 28 U.S.C. § 2254 ("Pet." (ECF No. 23)), by Ian Lemons ("Petitioner").  For the reasons stated below, the Petition will be denied.

I.   <u>BACKGROUND</u>

     Petitioner is presently confined at New Jersey State Prison, in Trenton, New Jersey.  (Pet. at 1.)  On June 29, 2005, he was convicted by a jury in the Superior Court of New Jersey, Atlantic County, of ten counts:  first-degree robbery, N.J.S.A. 2C:15-1 (count one); fourth-degree aggravated assault, N.J.S.A. 2C:12-1b(4) (count two); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4a (count three); third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5b (count

four); first-degree attempted murder, N.J.S.A. 2C:11-3a(1)(2) and N.J.S.A. 2C:5-1 (count five); second-degree aggravated assault, N.J.S.A. 2C:12-1b(1) (count six); third-degree aggravated assault, N.J.S.A. 2C:12-1b(2) (count seven); fourth-degree aggravated assault, N.J.S.A. 2C:12-1b(4) (count eight); and two counts of second-degree possession of a weapon by a convicted person, N.J.S.A. 2C:39-7 (counts nine and ten). State v. Lemons, 2007 WL 2012394, at *1 (N.J. Super. Ct. App. Div. July 13, 2007)(per curiam). Petitioner was subsequently sentenced to 54 years imprisonment. Id.

Petitioner filed a direct appeal, and the appellate court made the following findings.

> On August 14, 2004, nineteen-year-old Calvin Gunn was walking home from his job as a bellman at the Taj Mahal Casino in Atlantic City. On his way home, around 7:30 in the morning, Gunn stopped at the Cedar Market to purchase cigarettes for himself and his mother. At that time, Gunn was carrying his tip money, in addition to a paycheck from the Taj Mahal.
>
> Inside the Cedar Market, Gunn observed a black male in his early twenties wearing a black and white NBA hat, with his hair in cornrows, waiting at the counter. Gunn stated that the person's height was approximately five-nine or five-ten and that the person had a scruffy beard. After waiting approximately two minutes, during which time Gunn was so close that he could have reached out and touched the person, Gunn asked the man if he was done at the cash register. The man allowed him to go ahead of him and Gunn proceeded to purchase

2

his cigarettes and leave. As Gunn was
walking home, he noticed the man from the
Cedar Market standing in the doorway of a
building. As Gunn walked past the doorway,
the individual stepped out and placed a
silver semi-automatic weapon to Gunn's back
and told him to walk around the corner to an
alleyway. Gunn was able to see the gun prior
to it being placed against his back. When
they reached the alley, the individual
reached into Gunn's back pockets and removed
his wallet, cash, and the cigarettes while
Gunn surrendered his paycheck.

After taking these items, the perpetrator
walked to a silver Hyundai Elantra, sat
there for a moment, then drove off. Gunn
contacted the police, but by the time they
arrived the man was gone. The officers who
responded drove Gunn around in search of the
robber. Gunn told the police that if given
the opportunity he would be able to identify
the person who had robbed him.

Three days later, on August 17, 2004, Gunn
was walking to his girlfriend's house when
he noticed a group of men sitting on a
porch. One of the men broke away from the
group and started walking quickly towards
Gunn and reached under his shirt as if for a
gun. Gunn recognized this person as the man
who had robbed him three days prior and
began to run. He ran around the corner to
the apartment building of his friend,
Anthony. As Gunn entered the building he
slammed the door behind him, catching the
perpetrator's arm in the door. Gunn then
opened the door, and slammed it again to
close the door, and ran up to the third
floor where Anthony lived.

Gunn waited with his friend until he
believed that it would be safe to leave. He
did not contact the police at this point
because he believed the individual would
have already fled, and because the police
had not done anything the first time he

3

called, and because he did not want to be branded as a "snitch." After waiting awhile, Gunn proceeded to his girlfriend's home without incident and remained there for some time.

While at his girlfriend's home, Gunn got a call from his friend, Richard Trotter, to return to Anthony's home to play a newly released X-box game. Trotter picked Gunn up at the girlfriend's house, and as the two of them walked to Anthony's place, Gunn began to tell Trotter what had happened earlier. The two stopped to speak to a group of friends around the same place where Gunn had initially seen the robber earlier in the day. As the two continued to Anthony's place, Gunn stopped to tie his shoe. When he stood up, he realized that the man who had chased him earlier and who had robbed him three days before was "right there in [his] face." Gunn saw a gun pointed at him and attempted to push it out of his face. As he did so, the assailant fired the gun causing a bullet to lodge in Gunn's wrist. Gunn testified that he only heard two shots, and that he believed that only his hand and arm had been hit. The gunman then fled on foot.

Trotter called an ambulance and Gunn was transported to a nearby hospital for treatment. Gunn had also sustained at least two shots to his abdomen and had to undergo surgery. He testified that he did not recall speaking to officers at the scene, but the officers who responded testified that Gunn described his attacker as a light-skinned black male in his twenties with cornrows, wearing an orange shirt and blue jeans.

Two days after the incident, police obtained a taped statement from Gunn. Approximately one week after the incident, and following Gunn's discharge from the hospital, officers visited Gunn at his home. The officers showed Gunn three different photo arrays after telling him that the perpetrator might

4

not be in the lineup. After examining them,
Gunn identified a picture of the defendant
as the person who had robbed him and shot
him on August 14 and 17, respectively. Gunn
based his identification not on defendant's
hairstyle, but on defendant's facial
features. He also identified defendant
during the trial as the person who robbed
and shot him.

Trotter was uncooperative with the
investigation. He refused to give a taped
statement or to fill out any forms when
asked by the police. He told the police that
he ran to the side of the building when the
shooting started and remained there until it
concluded.  As a result, the shooter had his
back to Trotter and he did not see his face.
Trotter was also unable to give any specific
description of the shooter.

Defendant was arrested on November 23, 2004,
at the Atlantic City Medical Center, under
the name Jamal Anderson. Defendant testified
that he was using that name because of an
outstanding warrant for failure to appear in
court on an eluding charge.

At trial, defendant testified that at the
time of the shooting he did not wear his
hair in cornrows, but rather in box braids,
which are different from cornrows. He also
testified that, other than while in county
lockup, he had never worn orange clothing in
his life. Initially, defendant presented an
alibi statement that he was at a baby shower
on the day of the shooting. It was later
determined that the baby shower occurred on
a separate date and defendant testified that
he could not recall where he was on the day
of the shooting.

Lemons, 2007 WL 2012394, at *1-3.

The court denied Petitioner's claim that he was entitled to a Wade hearing.[1] Id. at *6.  A hearing was not required because the witness's identification of Petitioner from a photo array was not impermissibly suggestive.  Id.  Petitioner argued that all of the other men in the photo array had their hair in cornrows, and Petitioner's hair was braided.  Id.  The trial court viewed the photographs and found there was little to distinguish cornrows from braided hair.  Id.  The appellate court, in denying Petitioner's claim, relied on the victim's testimony that he identified Petitioner by his facial features, not his hairstyle; the fact that the victim's initial observations of Petitioner were made in well-lit conditions for a period of two minutes; and the fact that the victim viewed Petitioner on two subsequent occasions.  Id.

---

[1] The issue in Wade was "whether courtroom identifications of an accused at trial are to be excluded from evidence because the accused was exhibited to the witnesses before trial at a post-indictment lineup conducted for identification purposes without notice to and in the absence of the accused's appointed counsel." United States v. Wade, 388 U.S. 218, 219 (1967)("the accused's inability effectively to reconstruct at trial any unfairness that occurred at the lineup may deprive him of his only opportunity meaningfully to attack the credibility of the witness' courtroom identification.")  The Court could not determine whether the in-court identifications had an independent origin, which would render the absence of counsel at the pretrial identification harmless error.  Id. at 242. Therefore, the Court ordered the district court to hold a hearing on the matter.  Id.  After Wade, the Supreme Court held that, short of "a very substantial likelihood of irreparable misidentification," the reliability of identification evidence is for the jury to decide.  Manson v. Brathwaite, 432 U.S. 98, 116 (1977).

The court also denied Petitioner's claim that the trial court should have allowed him to present the victim with a photograph of a man who looked similar to Petitioner, to establish the victim's identification could have been incorrect. Id. at 7. The trial court did not rule on the admissibility of the photographs before opening statements were made, and defense counsel said in his opening statement that he may present photographs suggesting there may have been a misidentification. Id.

The trial court ultimately ruled the defense could not show the photograph to the jury because, even if it was not intended, it would create the inference that the person in the photograph might be the guilty party. Id. The defense asked for a mistrial because it had already represented to the jury that it may present photographs to determine whether the victim's identification of Petitioner was accurate. Id.

The appellate court agreed that the standard for admissibility of third-party guilt evidence was the appropriate standard for the trial court to apply, and that the evidence did not meet the standard. Id. at 8. The person depicted in the photograph that the defense wanted to show was a person who lived in the same area as Petitioner, and who happened to look like Petitioner. Id. at 9. Because there was nothing to tie the person in the photograph to the crime, the appellate court

held the trial court properly excluded the evidence.  Id.
Furthermore, the references to a photograph in the opening
statement were too vague to prejudice the defense.  Id.

Petitioner also attacked the court's submission of
aggravating factor #1 to the jury.  Id. at 9.  The jury was
instructed:

> Finally, there is a single other question
> that you're going to get that is as follows,
> and you'll simply answer this question yes
> or no unanimously and beyond a reasonable
> doubt:  do you find beyond a reasonable
> doubt that the nature and circumstances of
> the offenses and the role of the actor
> therein especially whether or not the crime
> was committed in an especially cruel,
> heinous or depraved manner.  And you will
> answer that yes or no.  All right?

(Brief and Appendix of Defendant-Appellant, State v.
Lemons, Doc. No. A-1886-05T4 ("Appellant's Brief") (N.J. Super.
Ct. App. Div.) (ECF No. 9-2 at 37.))

The appellate court found ample evidence supporting the
jury charge regarding aggravating factor #1, including
Petitioner robbed Gunn at gunpoint and, a few days later, chased
him in a likely attempt to kill him because he was the sole
witness to the robbery.  Lemons, 2007 WL 2012394, at *10.
Following his first failed attempt to shoot Gunn, Petitioner
sought him later that day and shot him five to seven times,
leaving him for dead.  Id.

Next, the appellate court rejected Petitioner's claim that his sentence was excessive. Id. Petitioner argued counts nine and ten[2] should have run concurrently because otherwise a felon could be sentenced for each day that he possessed the prohibited weapon. Id. The trial court imposed consecutive sentences because it found the crime involved separate acts, the robbery and, a few days later, the shooting. Id. Imposing consecutive sentences would deter a felon, once he possesses a firearm, from using it. Id.

The appellate court held that a sentencing court must apply the Yarbough factors[3] in determining whether to impose

---

[2] Counts Nine and Ten were counts of second-degree possession of a weapon by a convicted person. Lemons, 2007 WL 2012394, at *1.

[3] In State v. Yarbough, 100 N.J. 627 (1985), the court held a sentencing court should consider the following factors in determining whether to impose consecutive or concurrent sentences:  1) there shall be no free crimes in a system where punishment fits the crime; 2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision; 3) the sentencing court consider whether or not: (a) the crimes and their objectives were predominantly independent of each other; (b) the crimes involved separate acts of violence or threats of violence; (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior; (d) any of the crimes involved multiple victims; (e) the convictions for which the sentences are to be imposed are numerous; (4) there should be no double counting of aggravating factors; (5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense; and (6) there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious

consecutive sentences, and the sentencing court did so.  <u>Id.</u> at 11.  The sentencing court's discussion of the consecutive sentences indicated proper application of the factors.  <u>Id.</u> With respect to Petitioner's general claim that his sentence was excessive, the appellate court held the sentencing court properly applied aggravating factors one, three, six and nine, and mitigating factor 11.[4]  <u>Id.</u>  The sentencing court set out its reasoning, and it was supported by the weight of the evidence, and particularly Petitioner's criminal history.  <u>Id.</u> at 12. Finally, the appellate court rejected Petitioner's *pro se* argument[5] as without sufficient merit to warrant discussion.  <u>Id.</u> at 13.

After denial of his direct appeal, Petitioner sought post-conviction relief ("PCR").  On April 24, 2009, the PCR Court

---

offenses.  <u>Yarbough</u>, at 643-44, <u>cert.</u> <u>denied</u> 475 U.S. 1014 (1986)

[4] Aggravating Factor No. 1 was that Defendant acted in an especially cruel and depraved manner in committing the offenses against the victim. (ECF No. 10-6 at 35.)  Aggravating Factor No. 3 was the risk that Defendant would commit another offense. (ECF No. 10-6 at 36.)  Aggravating Factor No. 6 was the extent of his criminal record and seriousness of the offenses of conviction.  (<u>Id.</u>)  Aggravating Factor No. 9 was the need to deter Defendant and others from violating the law.  (<u>Id.</u>) Mitigating Factor No. 11 was that imprisonment would entail a hardship to the young dependent of the Defendant.  (ECF No. 10-6 at 37).

[5] In his supplemental *pro se* brief on direct appeal, Petitioner argued "the police cannot issue an arrest-warrant by signing the jurat on the complaint."  (Supplemental Brief on Behalf of the Appellant-Defendant, <u>State v. Lemons</u>, No. A-1886-05T4, (N.J. Super. Ct. App. Div.)(ECF No. 9-3 at 7.))

held a hearing, and denied Petitioner's claims.  (Stenographic Transcript of Post-Conviction Relief Motion, State v. Lemons, A-2080-09Tx (N.J. Super. Crim. Div. April 24, 2009)(ECF No. 10-7.))  Petitioner appealed, and the appellate court affirmed the PCR Court.  State v. Lemons, 2011 WL 3425608 (N.J. Super. Ct. App. Div. Aug. 8, 2011)(per curiam).

The appellate court addressed each ground for post-conviction relief.  First, Petitioner's counsel was not at fault for failing to determine that Petitioner's alibi defense was false.  Id. at *3.  Petitioner knew his alibi was untrue, and he insisted on testifying to it under oath.  Id.  It was not counsel's fault.  Id.

Second, Petitioner faulted counsel for not asking for a continuance to better prepare for trial.  Id. at *4.  The court denied the claim because Petitioner failed to offer any evidence concerning what further investigation would have gained.  Id. The court noted that, other than misidentification, Petitioner had no other defense to present.  Id.

Third, Petitioner claimed his counsel was ineffective for eliciting the following information:

> calling Atlantic City Police Detective
> Fauntleroy as a witness and eliciting
> testimony from him as to why defendant's
> photograph had been included by Detective
> Rauch, the person leading the investigation
> in the Gunn matter, in one of the three
> photo arrays shown to Gunn. According to

11

> Fauntleroy, who was employed in the police's
> Intelligence Unit, when going through
> robbery cases, he found two cases that were
> similar, one being the robbery of Gunn.
> Thereafter, he received information from the
> Communications Bureau that a source had
> called to identify defendant as the
> perpetrator in Gunn's case. Fauntleroy
> therefore forwarded to Detective Rauch a
> report containing the identifying
> information and the fact that defendant
> might be the gunman in the second robbery
> case.

Id. at *4.  The court disagreed that defense counsel was
ineffective for calling Fauntleroy because the State called
Detective Rauch and placed the same information on the record.
Id.  Defense counsel's purpose for calling Fauntleroy was to
elicit testimony that Petitioner was never charged in the second
robbery, creating the inference that he was not guilty of either
robbery, and casting doubt on the identification of Petitioner
by the Communications Bureau.  Id.

    The court acknowledged that it would have been more
effective for the defense to call Fauntleroy after the State
called Rauch, but the reason the defense called Fauntleroy first
was that he was retiring and moving to Florida the next day.
Id.  Thus, counsel had no choice but to call him while he was
still available.  Id.

    Fourth, Petitioner argued Gunn was permitted to do a side
by side comparison of photographs in a photo array
identification, and this violated the Attorney General

Guidelines. <u>Id.</u> Gunn was shown several photo arrays. <u>Id.</u> He was told that two of the arrays contained a photograph of a person who could be the perpetrator. <u>Id.</u> Gunn did not identify anyone in the first two arrays he was shown. <u>Id.</u> In the third array, he identified the fourth photograph as the person who shot him. <u>Id.</u> He was then shown the last two photographs, but he remained convinced that he had identified the perpetrator. <u>Id.</u>

Gunn was first shown the photographs one at a time, as required by the Guidelines, but the officer did not remove the photographs that were previously shown as he presented a new photograph. <u>Id.</u> at *5. The court agreed this was improper but held that if this had been brought to the trial judge's attention, he would have found the photo array procedure was not impermissibly suggestive, and it did not lead to an irreparable misidentification under standards set forth in <u>Manson v. Brathwaite</u>, 432 U.S. 98 (1977).[6] <u>Id.</u>

---

[6] In <u>Manson v. Brathwaite</u>, the Supreme Court, quoting <u>Simmons v. U.S.</u>, stated:

> Surely, we cannot say that under all the circumstances of this case there is "a very substantial likelihood of irreparable misidentification." *Id.*, at 384, 88 S.Ct., at 971. Short of that point, such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary

The appellate court noted defense counsel exhaustively explored the identification procedure, but Gunn remained steadfast in his identification.  Id.  Gunn had given a clear description of his attacker and had four opportunities to see Petitioner prior to the identification.  Id.  Thus, the court concluded Petitioner had not met the prejudice prong of the Strickland test for ineffective assistance of counsel.  Id.

Fifth, Petitioner argued counsel was ineffective by failing to retain expert witnesses to help with cross-examining the police officers.  Id.  For example, Petitioner asserted an expert on fingerprints could have helped counsel cross-examine Detective Jerry String, who testified that a print could not be lifted from a shell casing found at the scene.  Id.  Petitioner contended an expert could have offered rebuttal testimony that a partial print could have been lifted and used to exclude a particular person, even if it did not permit a perfect match. Id.  Petitioner presented to the PCR court an expert opinion concluding that it was possible to perform "elimination work." Id.

---

> grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

432 U.S. 98, 116 (1977).

The court denied Petitioner's claim because his expert had not examined the actual shell casing, and did not testify that he could have obtained useful information from it.  Id.  Additionally, Detective String testified that he did not see a smudge or anything else on the casing.  Id.  The court found no grounds to believe an expert would have been any benefit to the defense.  Id.

Petitioner's next argument was that his counsel should have objected to Detective Rauch's hearsay testimony about his interview with Trotter, Gunn's companion who refused to testify at trial.  Id. at 6.  Rauch testified that Trotter did not cooperate with police, Trotter ran around the corner when the shooting started and never saw the shooter's face, and he did not return until the shooter left the scene.  Id.  Although the testimony was hearsay, the appellate court did not see how it could have affected the result of the trial, and denied the claim.  Id.

Petitioner also attacked his counsel's failure to object to inflammatory testimony.  Id. at 7.  The court found the issue was barred by a procedural rule because Petitioner could have but failed to raise the issue on direct appeal.  Id.  Nonetheless, the court found the prosecutor's comments, either singly or in combination, were insufficient to warrant a new trial on grounds of prosecutorial misconduct.  Id.  Therefore,

15

it was inconsequential that defense counsel failed to object.
Id.

Petitioner's final argument concerning trial counsel was
that he should have requested a missing-witness charge regarding
Trotter.  Id.  Pursuant to State v. Clawans, 38 N.J. 162 (1962),
the court can charge the jury that the failure of a party to
produce a witness who had knowledge of the facts at issue
creates an inference that the party feared those facts would be
unfavorable to it.  Id.  The appellate court denied this claim
because the State subpoenaed Trotter and obtained a warrant for
his arrest as a material witness but could not compel his
presence at trial.  Id.  Furthermore, Trotter previously told
Detective Rauch that he never saw the shooter's face.  Id.
Thus, a Clawans charge was not justified.  Id.

Petitioner also contended his appellate counsel was
ineffective for failing to raise trial counsel's ineffectiveness
for all of the claims discussed above.  Id. at *8.  The court
denied this claim because the alleged ineffective assistance of
trial counsel did not warrant a hearing or a new trial.  Id.
The New Jersey Supreme Court denied certification.  State v.
Lemons, 209 N.J. 98 (Jan. 3. 2012).

In the petition before this Court, Petitioner raised the
following fourteen grounds for relief:

16

GROUND 1:  The defendant was denied the right to a fair trial when the trial court denied the defense request for a <u>Wade</u> hearing.

GROUND 2:  The defendant was denied the fundamental right to cross-examine the victim/witness, and defendant's motion for mistrial, after court reversed its original ruling and precluded defendant from cross-examine the victim with photograph of other persons who looked like the defendant, should have been granted.

GROUND 3:  The defendant was denied the right to effective assistance of counsel where the only evidence was identification of the defendant, counsel failed to timely move for a <u>Wade</u> hearing, counsel failed to adequately attack and present evidence to contradict or question the eyewitness identification, and counsel admitted that he had insufficient time to prepare for trial.

GROUND 4:  The defendant was denied the right to a fair consideration of aggravating sentencing Factor 1 due to inadequate jury instructions.

GROUND 5:  The consecutive N.E.R.A. sentences amounting to imprisonment for fifty-four years with parole ineligibility of forty-two years, three months and nineteen days were excessive.

GROUND 6:  The police cannot issue an arrest-warrant by signing the jurat[7] on the complaint.

GROUND 7 [Ground One in the Petition for Post-Conviction Relief]:  Defense counsel's failure to object to testimony about

---

[7] A jurat is "a certification added to an affidavit or deposition stating when and before what authority the affidavit or deposition was made."  Corpus Juris Secundum, 71 C.J.S. § 526 at n. 1 (citing Black's Law Dictionary (9th ed. 2009)).

information received concerning Mr. Lemons and his own incompetence in reinforcing that testimony during cross-examination denied Mr. Lemons his right to competent counsel and a fair trial.  U.S.Const. VI, XIV; N.J.Const. (1947) Art. I. Pars. 1, 9, 10.

GROUND 8:  Defense counsel failed to ask for a mistrial and/or a reopening of the "Wade" hearing after testimony during the trial showed a violation of the Attorney General Guidelines on eyewitness identification denying defendant effective counsel and a fair trial.  U.S.Const. VI, XIV; N.J.Const. (1947) Art. I. Pars. 1, 9, 10.

GROUND 9:  Counsel failed to consult or call experts denying Mr. Lemons his right to a fair trial. U.S.Const. VI, XIV; N.J.Const. (1947) Art. I. Pars. 1, 9, 10.

GROUND 10:  Counsel was ineffective by failing to conduct adequate pretrial preparation including investigation and issuing of subpoenas denying Mr. Lemons adequate and effective counsel.  U.S.Const. VI, XIV; N.J.Const. (1947) Art. I. Pars. 1, 9, 10.

GROUND 11:  Counsel was ineffective by failing to enter all appropriate objections during the trial denying Mr. [Lemons] his right to a fair trial.  U.S.Const. VI, XIV; N.J.Const. (1947) Art. I. Pars. 1, 9, 10.

> (A) Mr. Militia failed to object to hearsay testimony concerning Mr. Trotter's observations.
> (B) Mr. Militia failed to object to irrelevant and inflammatory testimony.
> (C) Mr. Militia failed to object to vouching conduct.
> (D) Mr. Militia failed to object to the prosecutors remarks that denigrated the defense.

(E)  Mr. Militia failed to object to
speculative comments and
misrepresentation made by the
prosecutor in closing.

GROUND 12:  Counsel was ineffective for
failing to request a Clawans charge.

GROUND 13:  Counsel was ineffective by not
requesting a continuance in the trial in the
timely manner or by formal motion.

GROUND 14:  Appellate counsel was
ineffective by not raising all issues.

Respondent opposed the petition, denying each ground for

relief.  (Answer to Amended Petition for Writ of Habeas Corpus

"Answer" (ECF No. 24.))  Petitioner filed a traverse.  (Amended

Traverse in Return to Answer on a Petition for a Writ of Habeas

Corpus Pursuant to 28 U.S.C. § 2248 ("Traverse") (ECF No. 25.))

II.  ANALYSIS

A.  Standard of Review

28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus
on behalf of a person in custody pursuant to
the judgment of a State court shall not be
granted with respect to any claim that was
adjudicated on the merits in State court
proceedings unless the adjudication of the
claim--
    (1) resulted in a decision that was
    contrary to, or involved an
    unreasonable application of, clearly
    established Federal law, as determined
    by the Supreme Court of the United
    States; or
    (2) resulted in a decision that was
    based on an unreasonable determination
    of the facts in light of the evidence

19

> presented in the State court
> proceeding.

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in U.S. Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from U.S. Supreme Court precedent and arrived at a different result than the Supreme Court. Eley v. Erickson, 712 F.3d 837, 846 (3d Cir. 2013)(citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). The phrase "clearly established Federal law" "refers to the holdings, not the dicta" of the U.S. Supreme Court's decisions. Williams, 529 U.S. at 412.

An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. Eley, 712 F.3d at 846 (quoting Renico v. Lett, 130 S.Ct. 1855, 1862 (2010)). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 562 U.S. 86, 99 (2011). Thus, when a state court summarily denies a claim "a habeas court must determine what arguments or theories ... *could have* supporte[d] the state court's decision; and then it must ask whether it is

20

possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Cullen v. Pinholster, 131 S.Ct. 1388, 1402 (2011)(quoting Harrington, 562 U.S. at 100 (emphasis added).

    B.   The Habeas Claims

        1.   Ground One

In Ground One of the petition, Petitioner alleged he was denied the right to a fair trial because the trial court refused to grant a Wade hearing. (Pet. at 6.) The defense sought a Wade hearing to challenge the validity of the out-of-court identification of Petitioner by the victim. (Id.) Respondent argued Petitioner failed to make the threshold showing that there was something about the out-of-court identification procedure that was unnecessarily suggestive and conducive to irreparable misidentification of the defendant. (Answer at 12-13.)

In his traverse, referring to his state appellate court brief on direct appeal (Traverse at 3), Petitioner asserted identification was crucial to the defense because it was the sole evidence in support of the conviction. (Appellant's Brief at 19, 22.) An anonymous caller provided Petitioner's name as someone possibly involved in similar robberies, and the caller described Petitioner as a light-skinned black male with

cornrows.  (Id. at 22.)  Once the police had Petitioner's name,
they found Petitioner's mug shot from 1997.  (Id.)

The police used the 1997 photograph of Petitioner in the
photo array presented to Gunn, although the photograph was taken
seven years prior to the crime, and Petitioner was thinner and
wore shorter hair.  (Id.)  All of the other persons in the photo
array wore cornrows, and Petitioner's hair was braided.  (Id. at
23.)  Although the prosecuting attorney had several
opportunities to see Petitioner in court, he chose someone else
from the photo array.  (Id.)  For these reasons, Petitioner
contended the trial court's denial of a Wade hearing denied him
a fair trial.  (Id.)

The Supreme Court case governing habeas review of this
claim is Simmons v. U.S., 390 U.S. 377 (1968), later quoted by
Manson v. Brathwaite, 432 U.S. 98, 105, 116 (1977).  Simmons
dictates that convictions based on eyewitness identification at
trial, following a pretrial identification by photograph, will
only be set aside if the photo identification procedure was "so
impermissibly suggestive to give rise to a very substantial
likelihood of irreparable misidentification."  390 U.S. at 384.

In this case, the state appellate court considered the fact
that Petitioner wore his hair braided and every other photograph
portrayed a person wearing cornrows.  Lemons, 2007 WL 2012394,
at *6.  However, there was little distinction between the two

22

hairstyles, and Gunn said that he identified Petitioner by his facial features, not his hairstyle.  Id.  The trial court looked at the photo array and found nothing suggestive about it, noting "a couple of these people look a lot alike." Id. at *5.  Thus, the appellate court was reasonable in concluding the photo array was not impermissibly suggestive.  The Court will deny Ground One of the Petition.

### 2.   Ground Two

In Ground Two of the petition, Petitioner asserted he was denied the right to cross-examine the victim by presenting photographs of people who looked like Petitioner, and the court erred in denying a mistrial after it precluded the defense from presenting the photographs after mentioning them in opening statements.  (Pet. at 6.)  In opposition, Respondent asserted the issue is not one of the right to confront the witness, but of the admissibility of evidence presented.  (Answer at 14.)

According to Respondent, the defense initially led the court to believe it would use a photograph of someone who looked like Petitioner to raise doubt about the identification procedure the police used before trial.  (Id. at 14-15.)  At trial, however, it became clear the defense intended to suggest to jurors that the individual in such photograph was actually the person who robbed Gunn and tried to kill him.  (Id. at 15.) This is when the trial court precluded use of the photograph.

(Id.)  Nonetheless, Petitioner took full advantage of the opportunity to test the reliability of Gunn's identification of Petitioner on cross-examination.  (Id. at 14.)  In his traverse, Petitioner argued that because Gunn's identification of Petitioner went to the heart of the State's case, Petitioner should have been allowed to confront him with the out-of-court photograph line-up that was used to make the identification. (Traverse at 4.)

In U.S. v. Owens, the Supreme Court held that the Sixth Amendment Confrontation Clause guaranteed an opportunity for effective cross-examination, "not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  484 U.S. 554, 558 (1988)(quoting Kentucky v. Stincer, 482 U.S. 730, 739 (1987)(quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985)).  The Court in Owens determined that the opportunity for effective cross-examination is not denied when a witness testifies about his current belief, even if he cannot recollect the reason for his belief, if the defense has the opportunity to bring out such factors as witness bias, lack of care and attentiveness, poor eyesight or bad memory.  484 U.S. at 559.

Here, Petitioner wanted to challenge the victim's prior identification of Petitioner in a photo array by showing the jury a photograph of a person who looked similar to Petitioner,

presumably showing that the victim could not distinguish it from a photograph of Petitioner.  <u>Lemons</u>, 2007 WL 2012394, at *6. The trial court did not allow this because, intentional or not, it feared the defense would suggest that the person in the photograph was actually guilty of the crimes Petitioner was charged with, and there was no evidence to support that theory. <u>Id.</u> at *7.

The question, under <u>Owens</u>, is whether the defense was otherwise able to cross-examine the victim regarding the reliability of his identification of Petitioner.  The state court reasonably concluded that the exclusion of the photograph did not impair defendant's ability to cross-examine the victim, constituting an infringement on defendant's right of confrontation.  Defense counsel exhaustively challenged Gunn on his identification of Petitioner.  (Trial Transcript, <u>State v. Lemons</u>, Indictment No. 95-01-0116 (N.J. Super. Ct. Crim Div. June 27, 2005)(ECF. No. 10-2 at 123-42.))  Therefore, the Court will deny Ground two of the habeas petition.

     3.  <u>Ground Three</u>

Petitioner's third ground for relief is that counsel failed to timely move for a <u>Wade</u> hearing, failed to adequately question the eyewitness identification, and failed to prepare for trial. (Pet. at 6.)  Respondent asserted there is nothing in the record to suggest the course of the prosecution would have been altered

25

in any way if defense counsel had asked for a <u>Wade</u> hearing
sooner.  (Answer at 17.)  Furthermore, Petitioner did not
explain how additional trial preparation by his attorney would
have changed the outcome of the trial.  (<u>Id.</u> 18-19.)  Petitioner
replied that counsel's failure to uncover potential witnesses
and failure to make any pretrial motions placed Petitioner's
chance for success in peril.  (Traverse at 6.)

The test announced by the Supreme Court in <u>Strickland v.
Washington</u>, 466 U.S. 668, 687 (1984), governs claims that a
Petitioner was denied a fair trial because his counsel provided
ineffective assistance.  <u>See</u> <u>Lafler v. Cooper</u>, 132 S.Ct. 1376,
1384-85 (2012)(applying <u>Strickland</u> test).  The <u>Strickland</u> test
has two prongs:

> First, the defendant must show that
> counsel's performance was deficient.  This
> requires showing that counsel made errors so
> serious that counsel was not functioning as
> the "counsel" guaranteed the defendant by
> the Sixth Amendment.  Second, the defendant
> must show that the deficient performance
> prejudiced the defense.  This requires
> showing that counsel's errors were so
> serious as to deprive the defendant of a
> fair trial, a trial whose result is
> reliable.

<u>Strickland</u>, 466 U.S. at 687.

The first prong of the test "requires a defendant to show
'that counsel's representation fell below an objective standard
of reasonableness.'"  <u>Lafler</u>, 132 S.Ct. at 1384 (quoting <u>Hill v.</u>

Lockhart, 474 U.S. 52, 57 (1985) (quoting Strickland, 466 U.S. at 688)).  There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689. "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." Yarborough v. Gentry, 540 U.S. 1, 8 (2003)(per curiam) (citing Bell v. Cone, 535 U.S. 685, 702 (2002); Kimmelman v. Morrison, 477 U.S. 365, 382 (1986); Strickland, 466 U.S. at 689; United States v. Cronic, 466 U.S. 648, 656 (1984)).

     "In cases where the record does not explicitly disclose trial counsel's actual strategy or lack thereof . . . the presumption may only be rebutted through a showing that no sound strategy posited [by the Respondent] could have supported the conduct." Thomas v. Varner, 428 F.3d 491, 500 (3d Cir. 2005) (citing Yarborough, 540 U.S. at 8 (2003)(per curiam)).  "[The Antiterrorism and Effective Death Penalty Act' requires that [habeas courts] 'determine what arguments or theories supported . . . or could have supported, the state court's decision.'" Collins v. Sec. of PA Dep't of Corr., 742 F.3d 528, 548 (3d Cir. 2014)(quoting Richter, 131 S.Ct. at 786).

27

The second prong of the Strickland test, prejudice, requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 546 (quoting Strickland, 466 U.S. at 694). The "ultimate focus" of the prejudice inquiry is on the fundamental fairness of the proceeding. Lafler, 132 S.Ct. at 1394 (quoting Strickland, 466 U.S. at 696). "A reasonable probability is one 'sufficient to undermine confidence in the outcome.'" Collins, 742 F.3d at 547 (quoting Strickland, 466 U.S. at 694). "Prejudice is viewed in light of the totality of the evidence at trial and the testimony at the collateral review hearing." Id. (citing Rolan v. Vaugh, 445 F.3d 671, 682 (3d. Cir. 2006)).

Trial counsel was not ineffective for failing to request a Wade hearing sooner because, as discussed above, Petitioner was not entitled to a Wade hearing. Furthermore, trial counsel exhaustively challenged the reliability of the victim's identification of Petitioner at trial. The fact that counsel was unsuccessful does not mean he provided ineffective assistance. Finally, Petitioner has argued only in general terms that further pretrial preparation might have yielded a different result. This is insufficient to state a claim for ineffective assistance of counsel. See Harrington, 562 U.S. at

112 ("The likelihood of a different result must be substantial, not just conceivable.")(citing Strickland, 466 U.S. at 693).

    4.   Ground Four

In Ground Four, Petitioner alleged the jury instruction on aggravating sentencing factor #1 was inadequate. (Pet. at 7.) Respondent opposed Ground Four because it involved questions solely of state law, thus it is precluded on habeas review. (Answer at 19.) In his traverse, Petitioner directed the court to his state appellate court brief on direct appeal. (Traverse at 7.) Petitioner cited a state case that, in turn, cited a United States Supreme Court case. (Appellant's brief at 38.) Petitioner's brief to the state appellate court on direct appeal stated "[a]ppropriate and proper charges to a jury are essential for a fair trial." (Id. citing Gabriel v. Auf Der Heide-Aragona, Inc., 14 N.J. Super. 558, 563-64 (N.J. Super. App. Div. 1951).

Gabriel quoted the U.S. Supreme Court, "[i]t is the duty of a court, in its relation to the jury, to protect parties from unjust verdicts, by making plain to the jury the issues they are to try, and by instructing them in the rules of law by which the evidence is to be examined and applied." 14 N.J. at 564 (quoting Pleasants v. Fant, 89 U.S. 116 (1874)). The Supreme Court in Pleasants did not address a particular constitutional claim.

A habeas court cannot address solely state law claims.
28 U.S.C. § 2254(a) provides:

> (a) The Supreme Court, a Justice thereof, a
> circuit judge, or a district court shall
> entertain an application for a writ of
> habeas corpus in behalf of a person in
> custody pursuant to the judgment of a State
> court only on the ground that he is in
> custody in violation of the Constitution or
> laws or treaties of the United States.

But even if <u>Pleasants</u> describes a constitutional standard
that jury instructions must make plain to the jury the issues
they are to try, it was not unreasonable for the state court to
hold the jury instruction given regarding aggravating factor #1
accomplished that purpose.  Although there is surplus language
in the Court's verbal instruction, it is plain that the jury was
instructed to determine, beyond a reasonable doubt, whether the
crime was committed in a cruel, heinous or depraved manner.
(<u>See</u> Jury Instruction, Appellant's Brief at 37.)

5.   <u>Ground Five</u>

In Ground Five of the petition, Petitioner contended his
sentence of fifty-four years, with parole ineligibility for
forty-two years, three months, and nineteen days was excessive.
(Pet. at 7.)  Respondent opposed Ground Five on the basis that
it does not involve a question of federal law.  (Answer at 19.)
In reply, Petitioner again referred the Court to his state
appellate court brief.  (Traverse at 7.)  Petitioner's brief to

the state court on direct appeal cited only state law in support
of his sentencing claim.  (Appellant's Brief at 42-47.)  Thus,
habeas relief is not available on this claim because it does not
allege Petitioner is in custody in violation of any federal law.
See Baldwin v. Reese, 541 U.S. 27, 29-31 (2004)(where claim in
state habeas petition did not cite a provision of the Federal
Constitution or cite any case that would have alerted the court
to the federal nature of the claim, federal claim was
unexhausted.)

      6.   Ground Six

In his sixth ground for relief, Petitioner asserted that
the police cannot issue an arrest warrant by signing the jurat
on the complaint.  (Pet. at 7.)  Respondent argued if there was
a defect in the complaint, it was cured by the indictment and
conviction.  (Answer at 19-20.)  In his traverse, Petitioner
contended this claim is akin to the claim addressed in Wong Sun
v. United States, 371 U.S. 471 (1963), and that a complaint and
warrant are one and the same.  (Traverse at 8.)

Petitioner presented this same issue to this Court in a
civil rights action in 2006.  See Lemons v. Atlantic City Police
Dep't, Civ. No. 06-3440(RMB), 2009 WL 140514, at *2-3 (D.N.J.
Jan. 20, 2009).  In granting the defendants' motion for summary
judgment in January 2009, this Court held Petitioner's Fourth
and Fourteenth Amendment constitutional rights were not violated

31

because although a police officer signed the warrant, the warrant was properly issued by the Deputy Court Administrator, pursuant to N.J. Stat. Ann. 2B:12-21a. Id. at *3. Furthermore, the officer who signed the jurat was presumptively the officer in charge of the police headquarters, and not the officer who participated in the arrest, in conformance with New Jersey law, N.J. Stat. Ann. 2B:12-21b. Id. at *2. Despite affirmance of this decision by the Third Circuit Court of Appeals, Petitioner continued to press this flawed argument in the present habeas petition. See Lemons v. Atlantic City Police Dep't, 347 F. App'x 722, 725 (3d Cir. 2009), cert. denied 558 U.S. 1117 (2010).

This claim, therefore, is precluded by collateral estoppel. Collateral estoppel, also called issue preclusion, prevents parties from relitigating an issue that has already been actually litigated. Peloro v. U.S., 488 F.3d 163, 174 (3d Cir. 2007). Issue preclusion is applicable when the following elements are established:

> "(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment." Burlington Northern Railroad Co. v. Hyundai Merch. Marine Co., 63 F.3d 1227, 1231–32 (3d Cir.1995) (quoting In re Graham, 973 F.2d 1089, 1097 (3d Cir.1992)); see also Parklane Hosiery Co. v. Shore, 439 U.S. 322,

326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552
(1979).

Id. The elements of collateral estoppel exist here and preclude
litigation of Ground Six of the petition.

Even if collateral estoppel did not apply, the state court
did not unreasonably apply the holding in Wong-Sun in denying
this claim on direct appeal.  Petitioner relies on dicta in Wong
Sun that states:

> The arrest warrant procedure serves to
> insure that the deliberate, impartial
> judgment of a judicial officer will be
> interposed between the citizen and the
> police, to assess the weight and credibility
> of the information which the complaining
> officer adduces as probable cause. Cf. Jones
> v. United States, 362 U.S. 257, 270, 80
> S.Ct. 725, 4 L.Ed.2d 697. To hold that an
> officer may act in his own, unchecked
> discretion upon information too vague and
> from too untested a source to permit a
> judicial officer to accept it as probable
> cause for an arrest warrant, would subvert
> this fundamental policy.

371 U.S. at 481.  The holding in Won Sun, however, is not
applicable to Petitioner's case.  The habeas standard of review
requires determining whether the state court reasonably applied
the *holding* of the relevant Supreme Court case to the
Petitioner's federal claim.  Williams, 529 U.S. at 412 ("the
phrase "clearly established Federal law" "refers to the
holdings, not the dicta" of the U.S. Supreme Court's decisions.)

33

The Supreme Court held that where the officers made no attempt to obtain an arrest warrant, the facts did not indicate probable cause supporting the warrantless entry into the defendant's home, and his subsequent arrest in his home.  Wong Sun, 371 U.S. at 484.  Petitioner does not challenge the facts supporting his arrest, only the form of the arrest warrant.

Furthermore, the Supreme Court in Stone v. Powell held that a habeas court is precluded from reviewing Fourth Amendment claims where the State has provided the Petitioner with an opportunity for full and fair litigation of a Fourth Amendment claim.  428 U.S. 465, 494 (1976).  Petitioner raised this issue in his supplemental pro se brief, and the New Jersey Superior Court, Appellate Division found it to be without merit.  See supra n. 5.  Thus, habeas relief is not available on this claim.

####    7.   Ground Seven

In Ground Seven of the habeas petition, Petitioner contended his trial counsel was ineffective because he called Detective Fauntleroy as a witness, and Fauntleroy hurt Petitioner's case by testifying to Petitioner's involvement in other armed robberies.  (Pet. at 8.)  Petitioner alleged "as a result, the state on cross-examination delved deeper into prohibited testimony of the other robberies, without an objection from defense counsel."  (Id.)

Respondent argued the defense theory was that Gunn mistakenly identified Petitioner from a photo array, and the Atlantic City police were determined to convict Petitioner for robbing and shooting Gunn only because they had heard that he committed other robberies. (Answer at 20.) In that context, there was a reason to ask Fauntleroy why they were investigating Petitioner. (Id.) Defense counsel followed up immediately with a question designed to let jurors know Petitioner was never charged with any other robberies. (Id. at 21.) Even more important, Respondent asserted, was that Petitioner suffered no prejudice because he testified in his own defense, which subjected him to testifying about his own criminal history. (Id. at 21.)

In his traverse, Petitioner relied on the argument presented by his counsel to the state appellate court. (Traverse at 8.) In state court, Petitioner argued there was no strategic reason to call Fauntleroy, and further, that defense counsel should have objected when the State elicited the same testimony from Rauch, that Petitioner was implicated in the present case because he had been implicated in other robberies. (Brief and Appendix on Behalf of Defendant-Appellant "PCR Brief", State v. Lemons, A-2080-09T4 (N.J. Super. Ct. App. Div.)( ECF No. 9-7 at 31-32.))

35

The state appellate court, on review of denial of Petitioner's post-conviction motion, addressed this claim:

> Defendant . . . argues that trial counsel was ineffective in calling Atlantic City Police Detective Fauntleroy as a witness and eliciting testimony from him as to why defendant's photograph had been included by Detective Rauch, the person leading the investigation in the Gunn matter, in one of the three photo arrays shown to Gunn. According to Fauntleroy, who was employed in the police's Intelligence Unit, when going through robbery cases, he found two cases that were similar, one being the robbery of Gunn. Thereafter, he received information from the Communications Bureau that a source had called to identify defendant as the perpetrator in Gunn's case. Fauntleroy therefore forwarded to Detective Rauch a report containing the identifying information and the fact that defendant might be the gunman in the second robbery case.
>
> Defendant claims that his counsel was ineffective because he solicited this information from Fauntleroy. However, we disagree. When the State called Detective Rauch, the same information was placed on the record. Defense counsel's apparent purpose in calling Fauntleroy was to elicit testimony that defendant had never been charged in the second robbery, to raise the inference that he was guilty of neither, and to cast doubt on the identification of defendant that had been received by the Communications Bureau. The fact that Fauntleroy was called as a witness out of order, during the course of the State's case, made his testimony appear damaging to defendant because it preceded that of Detective Rauch. If he had appeared after Detective Rauch had testified, counsel's strategy would have been more apparent. However, because Fauntleroy was retiring and

36

> moving to Florida on the following day, it
> was necessary for his testimony to be
> scheduled when it occurred. In the
> circumstances, we find no fault with
> counsel's strategic decision and no error in
> his determination to obtain Detective
> Fauntleroy's testimony while he remained
> available.

Lemons, 2011 WL 3425608, at *4.

Review of the trial transcript reveals that Defense counsel asked Fauntleroy, "did you, in fact, provide Detective Rauch with information that this gentleman, Mr. Lemons, may be involved in more than one robbery, other robberies?" (Trial Transcript, ECF No. 10-2 at 33.) Fauntleroy agreed. (Id.) Defense counsel then asked "Has Mr. Lemons been charged with any other robbery other than this matter?" Fauntleroy said he did not know. (Id.) At the conclusion of Fauntleroy's testimony, defense counsel asked, "to your knowledge then you have no knowledge of his arrest for other robberies, is that correct?" (Id. at 37-38.) Fauntleroy said, "Offhand, no I don't." (Id. at 38.) The prosecutor's cross examination of Fauntleroy was very brief and established that Fauntleroy was not directly involved in investigating Gunn's case. (Id.) He simply received some information suggesting that Petitioner *might* be involved in Gunn's crime, and he passed the information along. (Id.)

The State later called Detective Rauch.  (Trial Transcript,
ECF No. 10-3 at 59-119.)  Rauch never testified that Petitioner
was involved in any other robbery, and he said he had no idea
whether Petitioner was charged with any other crime.  (Id.)

In closing argument, defense counsel argued:

> . . . on the same date that Mr. Lemons got
> shot, magically you heard Detective
> Fauntleroy, the officer who testified and
> indicated that he was retiring, he indicated
> that he had received information from the
> Communications Bureau that Mr. Lemons may be
> involved in this or other robberies.
> And magically, his picture was produced.
> And despite those first two lineups, it was
> put in another lineup.  Now, all of the
> sudden, it's shown to the victim and,
> magically, Mr. Lemons, of all people is
> pointed out in photograph number four as
> being the robber and the shooter of Mr.
> Gunn.
>
> . . .
>
> But I suggest for what you heard from
> Detective Fauntleroy, Mr. Lemons having
> magically come up as a witness on the date
> that he himself is a shooting victim, having
> put that in the third lineup and the victim
> now all of the sudden saying, yes, that's
> the person, I suggest to you that it was in
> fact a misidentification . . .

(Id. at 72-73.)

The state appellate court was correct that it was the
defense strategy to call Detective Fauntleroy to establish doubt
about Gunn's identification of Petitioner, suggesting that the
police suspected Lemons based on some information they received,

and they subsequently created a suggestive photo lineup so Petitioner would be identified by Gunn.

The strategy did not work, but counsel was not deficient by trying to call into question why Gunn identified Petitioner. Reasonable strategic decisions by counsel cannot be the basis for an ineffective assistance claim when they turn out to be unsuccessful. See Werts v. Vaughn, 228 F.3d 178, 202-03 (3d Cir. 2000)("if the court determines that 'counsel made an informed choice, which at the time the decision was made reasonably could have been considered as advancing and protecting the [defendant's] interests,' counsel will not be deemed ineffective" (quoting Commonwealth v. Hill, 450 Pa. 477, 482, 301 A.2d 587, 590 (1973)).

Even if counsel's performance was deficient because he asked Fauntleroy whether he received any information that Petitioner may have been involved in other robberies, this did not prejudice Petitioner. Fauntleroy admitted that he had no knowledge that Petitioner was charged with any other robbery, and no witnesses testified that Petitioner was charged with another robbery. As the prosecutor and defense counsel argued in their closing statements, this case was about Gunn's identification of Petitioner, and the jury believed Gunn. Therefore, the state appellate court did not unreasonably apply

Strickland to this claim, and Ground Seven of the petition will
be denied.


8.    Ground Eight

In Ground Eight of the petition, Petitioner alleged trial
counsel was ineffective by failing to reopen a Wade hearing or
request a mistrial when it became apparent that the pre-trial
photo identification of Petitioner violated the Attorney General
Guidelines.  (Pet. at 8.)  In opposing Ground Eight, Respondent
contended it would not have mattered if defense counsel had
asked for a Wade hearing because there was never any basis to
grant such a hearing.  (Answer at 21-22.)  Additionally,
Respondent argued that although the police failed to remove each
photograph from the array from Petitioner's sight, Petitioner
never offered any reason that this would have influenced Gunn to
identify the wrong person.  (Answer at 22.)  Even if the photo
array procedure involved a minor deviation from the Attorney
General Guidelines, Respondent contended the procedure was not
unduly suggestive.  (Id.)

The state appellate court acknowledged that the Attorney
General Guidelines recommended a procedure where each photograph
shown to the witness is removed from the witness's sight before
the next photograph is presented, and this was not done here.
Lemons, 2007 WL 2012394, at *5.  There is, however, nothing in

40

the record suggesting how leaving all of the photographs in sight led to "a very substantial likelihood of irreparable misidentification," and there is no reason obvious to this Court that misidentification was likely here.  For the same reasons that the trial court did not violate Petitioner's constitutional rights by failing to grant a Wade hearing, trial counsel was not ineffective for failing to reopen the hearings or request a mistrial.

        9.   Ground Nine

In Ground Nine of the Petition, Petitioner alleged trial counsel's failure to call expert witnesses denied him his right to a fair trial.  (Pet. at 9.)  Petitioner contended counsel should have obtained an expert to testify that fingerprints could be lifted from bullet casings.  (Id.)  Respondent disagreed, asserting there are many measures police might have taken in their investigation of the case, and the proposed expert testimony would do nothing to exonerate Petitioner. (Answer at 22-23.)  Furthermore, Defense counsel could have told the jury that police did not try to get fingerprints from the shell casing without calling an expert. (Id.)

In his traverse, Petitioner referred the court to his state court brief (Traverse at 9), where he argued that an expert could have rebutted Detective String's testimony that he never heard of pulling a fingerprint off a shell casing.  (PCR Brief

at 38-39.)  An expert could have testified that a partial print, while not providing a complete match, could exclude a person. (Id. at 39.)  This testimony would have suggested the State did not do everything it could to be sure it had charged the right person.  (Id.)

Petitioner proposed only that he could have had an expert testify that it is possible to obtain partial prints from a shell casing, and a partial print can exclude a person as a match.  The expert did not propose to testify that there was a partial print on the casing.  Where the proposed expert testimony would not likely result in a different outcome at trial, counsel was not ineffective for failing to present it. See Pursell v. Horn, 187 F.Supp.2d 260, 363 (W.D. Pa. 2002) (where expert's proposed testimony did nothing to undercut the government's theory of premeditation, counsel was not ineffective for failing to call expert witness.)  The fact that it is theoretically possible to obtain a partial print from a shell casing to exclude a suspect, and that the police did not try to do so here, was not likely to change the outcome of the trial because there is no evidence that there was a partial print on the casing.

### 10.  Ground Ten

Ground Ten contained two parts.  (Pet. at 9.)  First, defense counsel failed to investigate Petitioner's alibi.  (Id.)

42

Second, defense counsel failed to subpoena Trotter to testify. (Id.)

As to the falsity of his alibi, Respondent contends a habeas petitioner is not entitled to relief when he tells his attorney he has an alibi, and his attorney relies on the representation. (Answer at 23-24.) In reply, Petitioner relied on his state court brief (Traverse at 9), where he argued counsel was ineffective by failing to interview the alibi witnesses before having Petitioner sign a sworn statement of his alibi that was provided to the prosecutor. (PCR Brief at 24.)

Respondent also contended it was reasonable for defense counsel not to obtain Trotter's testimony because Trotter never said anything that exonerated Petitioner. (Answer at 24.) Petitioner asserted Trotter was not expected to comply with the State's subpoena, and his testimony was important because he was the only witness to the shooting other than the victim. (PCR Brief at 46-47.)

Petitioner provided alibi information to his trial counsel that he was at a baby shower at the time of the shooting, and he identified twelve witnesses. Lemons, 2011 WL 3425608, at *2. Two weeks prior to trial, the prosecutor discovered the baby shower occurred the day after the shooting. Id. Petitioner testified at trial, but he did not have much to say because he did not have an alibi. Id.

43

"Defense counsel may properly rely on information supplied by the defendant in determining the nature and scope of the needed pretrial investigation as the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Peterkin v. Horn, 176 F.Supp.2d 342, 375 (E.D. Pa. 2001)(citing Lewis v. Mazurkiewicz, 915 F.2d 106, 111 (3d Cir. 1990)).  Counsel reasonably relied on Petitioner's representation to him that he had an alibi for the crime.  Without having any reason to believe Petitioner was lying or that he would be mistaken about something so important as his whereabouts at the time of the crime, counsel was not required to investigate the information Petitioner gave him to support his defense.

Additionally, there is nothing in the record to suggest Trotter would have testified in any way favorable to Petitioner. The only information Trotter ever gave about the shooting is that he ran and never saw the shooter's face, and could not identify the shooter.  Lemons, 2011 WL 3425608, at *6. Compare Hodgson v. Warren, 622 F.3d 591, 599-600 (6th Cir. 2010)(counsel was ineffective by failing to ensure jury heard witness's testimony that would have refuted the State's theory that Hodgson was the shooter.)  Here, counsel was not ineffective for failing to secure Trotter's attendance as a

44

witness at trial because Trotter would likely only have testified that he did not see the shooter.

      11.  <u>Ground Eleven</u>

In Ground Eleven, Petitioner alleged he was denied his right to a fair trial because his counsel failed to object to highly improper and prejudicial matters.  (Pet. at 9.) Objectionable material included:  1) hearsay testimony about Trotter's observations; 2) Gunn's testimony that he and his mother lost their home as a result of the shooting; 3) the prosecutor's comments that the defense cross-examined the victim as if he were the one on trial; 4) telling the jury Gunn should have died after being shot five times; telling the jury Gunn's life meant nothing to Petitioner; speculating about the amount of time Gunn spent looking at the assailant's face; 5) speculation about why Officer McMahon's account of what Gunn said to him was different; and 6) the prosecutor misrepresented the science about eyewitness identification by suggesting that a person would remember seeing someone who was going to do them harm.  (Pet. at 11.) Respondent contended none of the objections Petitioner asserted required an objection, and the supposedly objectionable material had no ability to sway the jurors. (Answer at 24-26.)

The standard announced by the Supreme Court for prosecutorial misconduct to rise to the level of a

45

constitutional violation is whether the misconduct "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Comments that are inappropriate or even deserving of universal condemnation do not rise to the denial of due process. Darden v. Wainwright, 477 U.S. 168, 181 (1986).

The prosecutor's closing statement was focused on Gunn's identification of Petitioner, and rebutting the defense's arguments regarding misidentification. (Trial Transcript (ECF No. 10-5 at 76-99.)) The bulk of the prosecutor's closing statement highlighted specific testimony by Gunn, suggesting that Petitioner's identification was reliable. (Id.)

In context, the argument that Gunn should have been dead was not prejudicial because Petitioner was accused of attempted murder, and the evidence showed Gunn was shot five times. It was also not improper for Gunn to testify that he lost his job because he could not work due to his injuries, and subsequently lost his house.

Defense counsel, in his closing statement, said "Why even though Mr. Gunn appeared to be a reasonable, a well-meaning, a well-intentioned young gentleman . . . his ability to really clearly tell you, the jury, beyond a reasonable doubt that it was Mr. Lemons . . . the individual that robbed and shot him, I think that is in fact deficient, and, in fact, you should have

46

more than reasonable doubt." (Id. at 75.)  Gunn must have presented as well-intentioned person, causing the defense to recognize this to the jury.  Thus, the fact that the prosecutor called Gunn "a good kid" would not bias the jury.

Here, the focus on the closing arguments was the evidence concerning Gunn's identification of Petitioner, and there is nothing in the prosecutor's argument that would cause the jury to ignore the evidence and reach a verdict on an improper basis. The misconduct alleged by Petitioner did not infect the trial with unfairness, and the Court will deny Ground Eleven of the petition.

### 12.  Ground Twelve

For his twelfth ground for relief, Petitioner alleged his counsel was ineffective by failing to request a jury instruction about the State's failure to call Trotter as a witness. (Pet. at 11.)  Petitioner argued the jury should have been instructed it could draw an inference that Trotter's testimony would not have been favorable to the State because the State did not call him as a witness. (Id.)  Respondent asserted the trial court would not have granted an absent-witness instruction because Petitioner did not suggest Trotter had evidence superior to that which was before the jury or that any such evidence could have been produced by the State. (Answer at 26-27.)

There is no evidence in the record suggesting Petitioner was prejudiced by the absence of Trotter as a witness at trial. The only information in the record about Trotter is that he insisted he never saw the shooter, and he was completely uncooperative.  Lemons, 2007 WL 2012394, at *3.  There was no basis for a jury instruction, and Petitioner was not prejudiced. Therefore, the state court reasonably rejected Petitioner's ineffective assistance of counsel claim under the Strickland test.

### 13.  Ground Thirteen

According to Petitioner, his trial counsel admitted he was not prepared for trial.  (Pet. at 11.)  Thus, in Ground Thirteen, Petitioner asserted counsel was ineffective by failing to make a proper motion for a continuance, and that he was prejudiced because counsel did not have time to investigate the accuracy of the times and dates Petitioner provided regarding his alibi defense.  (Id.)  Even if defense counsel requested and was granted a continuance, Respondent argued there is no evidence the result of the trial would have been any different if counsel had more time to prepare for trial.  (Answer at 27.)

For the same reasons counsel was not ineffective for failing to investigate Petitioner's alibi, counsel was not ineffective for failing to ask for a continuance so he could

48

investigate Petitioner's alibi.  The state court's application of Strickland in denying this claim was not unreasonable.

       14.  Ground Fourteen

     Petitioner's final claim was that his appellate counsel was ineffective because he did not raise all of the claims raised here on appeal.  (Pet. at 11.)  Where none of the arguments that counsel failed to raise on appeal would have warranted reversal of Petitioner's conviction, Respondent argued counsel was not ineffective by failing to raise such claims.  (Answer at 28.) In his traverse, Petitioner urged the Court to find that appellate counsel's shortcomings were tantamount to abdicating his duty to advocate for Petitioner's cause.  (Traverse at 11.)

     Appellate counsel is not ineffective by failing to raise meritless claims.  See Aparicio v. Artuz, 269 F.3d 78, 99 (2nd Cir. 2001) ("The failure to include a meritless argument does not fall outside the 'wide range of professionally competent assistance' to which Petitioner was entitled" (quoting Jameson v. Coughlin, 22 F.3d 427, 429-30 (2d Cir. 1994)(quoting Strickland, 466 U.S. at 690)).  Thus, the Court will deny Ground Fourteen of the habeas petition.

III. CONCLUSION

     For the reasons set forth above, the Petition under 28 U.S.C. § 2254 [Doc. No. 23] will be denied on the merits.  An appropriate order follows.

IV.   <u>CERTIFICATE OF APPEALABILITY</u>

This Court must determine whether Petitioner is entitled to a certificate of appealability in this matter.   <u>See</u> Third Circuit Local Appellate Rule 22.2.   The Court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).   This Court's discussion of Petitioner's claims demonstrates that Petitioner has not made such a showing. The Court will not issue a certification of appealability.

s/Renée Marie Bumb
**RENÉE MARIE BUMB**
**United States District Judge**

Dated: April 1, 2015